## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHAEL RAY STEMPLE, #370-484, \*
 #1373712 \*
   \*
Plaintiff,   \*
   \*
v   \* Civil Action No. CCB-17-1539
   \* (Consol. with Civil Action No. 17-1782)
DENISE GELSINGER, *Acting Warden,MCI-H*,\*
RICARD GRAHAM, *Warden, WCI*, \*
RICHARD DOVEY, *Warden, JCI*, \*
SERGEANT LANE,  \*
SERGEANT MOONEY,  \*
CAPTAIN ROLAND,  \*
LIEUTENANT ROMAN,  \*
LIEUTENANT MCFARLAND, and \*
HETTIE WILSON, PA,[1] \*
   \*
Defendants.  \*
     \*\*\*

## MEMORANDUM

Michael Ray Stemple is incarcerated at the Maryland Correctional Training Center in Hagerstown, Maryland (MCTC). In this consolidated action, Stemple alleges that defendants failed to protect him from harm when he was assaulted at Jessup Correctional Institution (JCI) on May 21, 2017, provided inadequate medical care, and, after the assault, improperly placed him in segregation housing. ECF 1, 3, 9. Defendants, Richard J. Graham, Jr., Warden of Western Correctional Institution ("WCI"), Denise Gelsinger, Acting Warden of Maryland Correctional Institution-Hagerstown ("MCI-H"), Richard Dovey, Warden of MCTC, John Wolfe, Warden of JCI, Lt. McFarland, Lt. Roman, Captain Roland, Sgt. Lane, and Sgt. Mooney[2] (collectively, the

---

[1] The Clerk shall amend the docket to reflect defendants' names and titles.
[2] Stemple also appears to have named Lieutenant Shinko as a defendant. ECF 8. Service was not obtained on Shinko. For reasons discussed in this memorandum, Shinko would be entitled to summary judgment as to the claims raised here had service been accepted.

State Defendants), by their attorneys, move, pursuant to Fed. R. Civ. P. 12(b) to dismiss the complaint, or in the alternative, move pursuant to Fed. R. Civ. P. 56 for summary judgment. ECF 23. Defendant Hettie Wilson, P.A., by her counsel, separately moves for dismissal pursuant to Fed. R. Civ. P. 12(b) or in the alternative for summary judgment pursuant to Fed. R. Civ. P. 56. ECF 35. Stemple filed oppositions to both motions. ECF 27, 39.[3] The State Defendants and Wilson filed separate replies. ECF 30, 40. Also pending are Stemple's self-titled motions to intervene (ECF 34, 44) and to compel (ECF 41), which include requests for appointment of counsel.

Having reviewed the pleadings, briefs, and exhibits, the court finds that a hearing is unnecessary to decide the motions. *See* Local R. 105.6 (D. Md. 2016). For the reasons set forth below, the motions to intervene (ECF 34, 44) and to compel (ECF 41) will be denied. Defendants' dispositive motions (ECF 23, 35) will be treated as motions for summary judgment and GRANTED.

## BACKGROUND

Stemple filed Civil Action No. CCB-17-1539 on June 2, 2017, and Civil Action No. CCB-17-1782 on June 28, 2017. The court ordered the cases consolidated on August 17, 2017. ECF 8. On October 18, 2017, the court dismissed defendant inmate Calvin Carter. ECF 20.

### I.     Stemple's Allegations

Stemple states that on August 16, 2016, while incarcerated at MCI-H, he was investigated as a member of the Aryan Brotherhood (AB), a security threat group. ECF 9

---

[3] Pursuant to *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), the Clerk mailed notices to Stemple, advising him of his right to respond to Defendants' dispositive motions. ECF 24, 36. Stemple has not filed a declaration or other verified exhibit. Stemple's opposition to Wilson's motion is titled "Affidavit of Fact." ECF 39. Stemple, however, did not include a declaration or other oath in that document. ECF 39.

at p. 2. He explains that two days before, on August 14, 2016, an inmate at JCI was killed in what Stemple asserts was a conflict between members of the AB and Dead Man Incorporated (DMI), another security threat group. Stemple claims to not be an AB member, and notes that he bears no tattoos or other marks associated with the group. ECF 9-1 at p. 5; ECF 9 at p. 5.

On December 5, 2016, Stemple was transferred to WCI where he was housed "behind door" until May 5, 2017, when he was sent to JCI. ECF 9 at p. 2; *see also* Traffic History, ECF 23-6 at p. 4 (showing Stemple's assignment to administrative segregation at WCI). Stemple alleges that DMI gang members at WCI who had been at MCI-H assumed he was a member of AB because he had been housed with AB members. ECF 9 at pp. 5, 6. When Stemple questioned his housing situation at WCI, Stemple alleges that Lieutenant McFarland told him that "MCI-H has placed a very big bull's eye on his back." ECF 9 at p. 5; ECF 9-1 at p. 5.

Stemple alleges that on May 4, 2017, at 1:00 a.m. he was told that he was being transferred to JCI. ECF at p.6. Stemple refused to pack his belongings and asked to see a lieutenant because JCI was where it "all started." ECF 9 at p. 6. The unidentified correctional officer returned and said that he had been mistaken, Stemple was going to MCTC. The following day, Stemple was sent to MCTC, where he was placed on a bus and transferred to JCI. ECF 9 at p. 6.

Stemple alleges that when he arrived at JCI "the intel stated to me this was a no DMI compound." ECF 1 at p. 2. Sergeant Lane told him that no DMI members were allowed at JCI. ECF 9 at p. 6. Stemple asserts that even though he did not sign a body waiver consenting to placement in the general prison population at JCI, he was placed in

3

the general population. ECF 1 at pp. 2-3; ECF 9 at pp. 2, 6; *see also* Traffic History ECF 23-6 at p. 4 (indicating general population housing). Stemple avers that he told Sergeant Mooney three times that he had "issues" with his cellmate Calvin Carter, who claimed he was a friend of the DMI inmate who was killed at JCI. ECF 9 at p. 7; ECF 9-1 at p. 3. Mooney promised to talk to Stemple, but never did. ECF 9 at p. 7; ECF 9-1 at p. 3.

Stemple claims that on May 21, 2017, Carter stabbed him three times in the shoulder. Stemple was sent to the University of Maryland Medical System (UMMS) Shock Trauma Center for treatment. ECF 1 at p. 1. Stemple claims he was used as a "lab rat" to see whether it was safe for other AB inmates to come off protective custody. ECF 9 at p. 2; ECF 1 at p. 3.

After Stemple returned from UMMS on May 21, 2017, he was placed on administrative segregation at JCI, and he alleges his medical needs were not addressed there. ECF 9 at pp. 7-8; ECF 1 at p. 2. Stemple alleges Lieutenant Roman and Captain Roland assured him he would "stay behind door" until he healed. ECF 9 at pp. 7-8. Stemple claims he had to argue with the correctional officers to have his bandages changed because they told him there was no paperwork. Stemple asserts he was never given paperwork to sign putting him on protective custody and "yet they thought I was in hospital." ECF 9 at p. 9.

Stemple alleges that he was denied medical care from May 22, 2017 to July 21, 2017. ECF 9-1 at p. 3. He alleges that he went without any medical care for over 33 days as of June 24, 2017. ECF 9 at p. 7-8. He claims that he did not receive his chronic care medications, had to clean his own stab wounds, and received no medication to alleviate his pain. ECF 9 at p. 8. He asserts he was denied access to a physician, causing

4

him to suffer numbness in his hands and arms, pain in his shoulders, and unspecified issues regarding his neck. ECF 9 at pp. 8-9. He claims he attempted to file administrative remedy procedure requests (ARP) about his medical concerns, but correctional officers at JCI told him that they must be signed by a lieutenant or a higher ranking officer. ECF 9 at p. 8. Stemple alleges that Defendant Wilson told him that she cannot treat his stab wounds or provide him medications. ECF 9 at p. 8.

Stemple seeks damages for pain, suffering, and future medical bills. He asks to be provided medical care by an outside physician. ECF 9-1 at p. 6; ECF 9 at p. 10. In his "Motion to Compel" Stemple appears to ask the court to hold Wilson liable for failing to respond beyond his chronic care needs for headaches and lower back pain and to address his issues arising from his May 21, 2017 stabbing. ECF 41 at pp 1-2.

In his motions to intervene, Stemple states that after his transfer from JCI to MCTC, he was assaulted with a razor blade on April 9, 2018, by a "so called DMI gang member," and needed 8-9 stitches for the laceration on his neck. ECF 34 at p. 1; ECF 44 at p. 1. He states he is again "behind the door." ECF 34 at p. 2. He claims his neck and hands still go numb and he is being denied medical care for his chronic lower back pain. ECF 34 at pp. 1, 2. Stemple asks "the Court and the Attorney General's Office to intervene" on his behalf to provide medical care or a doctor. ECF 34 at pp. 1, 4. Stemple states "MCTC has done actually nothing but sent actual DMI members who called the shot to hit me out [sic]of MCTC. Yet put me on a transfer list to any compound." ECF 44 at p. 1. He claims he is being denied medical care, is in pain, and no detective has contacted him in regard to either assault. ECF 44 at p.2. He asks for legal counsel to represent him. ECF 34 at p. 3.

Stemple may present his claims arising from the assault at MCTC in his later filed case, *Stemple v. Warden*, Civil Action CCB-18-2573, now pending before this court. The court notes that Stemple acknowledges in these motions that he is in administrative segregation housing at MCTC for his safety and his medical record demonstrates that he has received ongoing treatment for his chronic pain concerns. Thus, there are at this time no extraordinary circumstances in his motions to warrant appointment of counsel.

To the extent Stemple is seeking preliminary injunctive relief, he must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)); *see also Real Truth About Obama, Inc. v Fed. Election Comm'n*, 575 F.3d 342, 345 (applying the preliminary injunction standard set forth in *Winter*). Stemple does not address these standards, and for reasons apparent in this memorandum, fails to establish he is likely to succeed on the merits.

## II.    State Defendants' Response

The State Defendants filed declarations and verified copies of Stemple's medical records with their Motion for Summary Judgment. ECF 23. These records show that on August 16, 2016, Stemple, then incarcerated at MCI-H, asked Lieutenant Mary Louk to place him on administrative segregation for his protection because he had associated with some AB members. Louk declares that Stemple told her that due to gang violence at another correctional institution involving AB Stemple felt he was being targeted, was not

6

comfortable in the general prison population, and wanted to be placed "behind the door." Decl. of Lieutenant Louk, ECF 23-4 ¶ 3. At the time, Stemple was not flagged as being a gang affiliate. ECF 23-4 ¶ 5; ECF 23-4 at p. 3. Louk explains that members of the AB were being placed on state-wide lock-up for safety and security reasons due to gang violence at another facility. ECF 23-4 ¶ 4. Based on Stemple's request, Louk wrote an administrative segregation investigation report the same day recommending Stemple's placement on administrative segregation pending investigation of his safety concerns. ECF 23-4 ¶ 6; ECF 23-4 at p. 3. Stemple was assigned to administration segregation the same day, August 16, 2016. ECF 23-5 at 3; ECF 23-4 ¶ 7. From December 2015 until December of 2016, when Stemple was transferred out of MCI-H, he did not file any ARPs about these issues. Decl. of Betty McNamee, MCI-H, ECF 23-5 ¶ 2.

On December 5, 2016, Stemple was moved to WCI where he was offered housing in the general prison population. ECF 23-6 at p. 5; Decl. of Lieutenant McFarland, ECF No. 23-7 ¶ 4. McFarland states Stemple was "formerly flagged as AB, but after investigation it was determined he was tagged erroneously and not affiliated with AB." ECF 23-7 ¶ 4. Stemple told McFarland and the segregation review board that he wanted to be placed on administrative segregation. ECF 23-7 ¶ 4. Stemple explained that while at MCI-H he had been "behind the door" with members of the AB. ECF 23-7 ¶ 4; *see also* ECF 9 at p. 5 (asserting that WCI housed "a lot of DMIs"). Stemple met monthly with the segregation review board to discuss his housing status. ECF 23-7 ¶ 5. At one meeting, Stemple asked to be transferred from WCI to an institution where he could live in the general population so that he could work to earn diminution credits and pay. ECF 23-7 ¶ 6; *see also* Inmate Request dated March 26, 2017, Decl. of Tennile Winters, ECF

7

23-8 (requesting transfer to earn days and pay). Stemple was informed at a subsequent meeting that he would be transferred to JCI. ECF 23-7 ¶ 7. McFarland declares that he did not make the decision to transfer Stemple to JCI and, at that meeting, Stemple did not object to the transfer. ECF 23-7 ¶¶ 7, 8.

Stemple arrived at JCI on May 5, 2017. ECF 23-6 at p. 4. Sergeant Mooney states in his declaration that he never had any conversations with Stemple. Decl. of Sergeant Mooney, ECF 23-15 ¶ 3. Mooney declares that before May 22, 2017, he had no information to lead him to believe that Stemple was in "any particular, substantial, or extreme risk to his health or safety by his cellmate or any other inmate." ECF 23-15 ¶ 4. Further prison records indicate that Calvin Carter is not a member of DMI or affiliated with any prison gang. Decl. of Susan Shumaker, ECF 30-1 at ¶3; *see also* Decl. of Warden Wolfe, ECF 23-11 ¶ 6 (declaring "[i]n May 2017, because of past gang violence, JCI did not house any known members of the DMI gang"). Importantly, Stemple provides no declaration, verified exhibits, or other information to refute this information.

On May 21, 2017, at approximately 1:35 p.m. correctional officers in the dayroom in D-Building, A-wing, observed Stemple with blood on his shirt. ECF 23-6 at p. 17. Stemple was taken first to the prison medical department for evaluation and then to UMMS. ECF 23-6 at pp. 18-21, 38. Stemple left JCI for UMMS at 2:30 p.m. ECF 23-9 at pp. 76, 77, 80; ECF 23-6 at 38. Stemple returned to JCI that evening, was examined by medical personnel, cleared to return to custodial housing with medical follow-up, and assigned to segregation housing pending investigation of the assault. ECF 23-9 at pp. 12, 13; ECF 23-6 at p. 39-40.

Detective Dominic Bonvegna of the Internal Investigation Division (IID) began his investigation of the stabbing on the same day as the incident. IID Report, ECF 23-10;

*see also* ECF 23-6 at pp. 17, 18. Bonvegna's review of the Serious Incident Report found there was no surveillance footage of the incident because the video camera was not working, no weapons were found at the crime scene, and no officers had witnessed the incident. ECF 23-10 at 7; *see also* ECF 23-10 at 19, ECF 23-6 at 12, 13.

On October 4, 2017, when Bonvegna interviewed Stemple at MCTC, Stemple told him that Carter had stabbed him.[4] ECF 23-10 at p. 7. Calvin Carter denied the allegation. ECF 23-10 at 6, 7; ECF 23-6 at p. 48. Bonvegna's IID report states:

> Stemple stated that he had confronted Inmate Carter about taking some of his belongings. Inmate Stemple also stated that Inmate Carter also thought he was associated with the Aryan Brotherhood (AB).
>
> Inmate Stemple stated that while he was at Maryland Correctional Institution-Hagerstown, (MCI-H) he was housed with AB members and everyone assumed that he was part of AB. Inmate Stemple advised that he feels the prison did this on purpose. Inmate Stemple advised that he is always housed with AB members and he feels that because of this he was assaulted by Inmate Carter.

ECF 23-10 at p. 7.

Stemple told Bonvegna that inmates "Shawn" and "Squirrel" witnessed the attack. ECF 23-10 at p. 7. Bonvegna contacted inmates Shawn Parks and Ronald Jones ("Squirrel"). Parks said he did not see the incident, and Jones said he saw Carter stab Stemple, but was unwilling to testify in court. ECF 23-10 at p. 7. Bonvegna concluded that "[b]ased on the fact that there is no surveillance video of the incident and the only witness to the incident," Ronald Jones, was unwilling to testify, "I request that a copy of this case be sent to the Maryland State's Attorney's Office of Anne Arundel County for further review." ECF 23-10 at p. 8. The case was forwarded to the State's Attorney for Anne Arundel County on November 30, 2017, for further evaluation. Decl. of Britt

---

[4] Initially, Stemple refused to identify his assailant when questioned by Captain Curtis Henson at JCI. ECF 23-10 at p. 2; ECF 23-6 at p. 36.

Brengle, ECF 23-10 at p. 1. Stemple was transferred from JCI to MCTC on July 21, 2017. ECF 23-6 at p. 4.

Medical services are provided to inmates by a private corporation that contracts with the Department of Public Safety and Correctional Services. Decl. of Warden John Wolfe, ECF 23-11 ¶ 2; Decl. of Warden Richard Dovey, ECF 23-12 ¶ 2. Neither the Warden nor correctional employees are personally involved in providing medical care to inmates, prescribing medications or particular treatments, or recommending a particular treatment or procedure. An inmate can fill out a sick call slip to request medical evaluation and treatment. Inmate sick call slips are collected and reviewed by the medical contractor's personnel who schedule appointment dates. ECF 23-11 ¶ 3; ECF 23-12 ¶ 3. Wardens Wolfe and Dovey declare that neither they nor their employees have interfered with, hindered, or delayed medical treatment or care to Stemple. ECF 23-11 ¶ 5; ECF 23-12 ¶ 5; *see also* Decl. of Sergeant Mooney, ECF 23-15 ¶ 5.

### III.    Wilson's Response

Hettie Wilson, P.A. filed 109 pages of Stemple's medical records in support of her dispositive motion. ECF 35-4. Wilson saw Stemple three times: June 9, 22, and 29, 2017. ECF 35-4 at pp. 16-18, 19-21. Stemple's medical care during the times relevant to his complaint are summarized below.

On May 20, 2017, Mathew Carpenter, P.A. saw Stemple for complaints of headaches occurring every other day. Stemple reported suffering migraine headaches his entire life and explained that using distance vision triggers headaches. ECF 35-4 at pp. 2, 39; Decl. of Erwin Aldana, M.D. ECF 35-5 ¶ 7. Carpenter requested an optometry consultation for Stemple, discontinued his headache medicine, Fioricet, and started him

on Excedrin Tension Headache. Carpenter increased Stemple's Neurontin to treat his back pain and discontinued his prescriptions for Baclofen and Nortriptyline. Carpenter also ordered an x-ray of Stemple's back and gave him information on back exercises. ECF 35-4 at pp. 2-4.

Stemple was stabbed the next day, May 21, 2017. Jewaher Abubaker, P.A. examined Stemple at JCI following the assault. Stemple was bleeding profusely from two deep stab wounds to both upper shoulders. Stemple also complained of neck pain. ECF 35-4 at p. 6. Abubaker cleaned the wounds and applied pressure dressing to control the bleeding. Stemple was sent to the emergency room at UMMS for evaluation and treatment, where he was prescribed a one-time dose of Tylenol # 3.[5] ECF 35-4 at pp. 6, 92. Stemple's CT scan revealed no evidence of damage to vital organs and he was discharged with plans for wound care and pain management, and to follow-up in two days. ECF 35-4 at p. 9, 10. He was released back to DPSCS with a recommendation to use Motrin or Tylenol for pain. ECF 35-5 ¶ 4.

On May 22, 27, and 29, medical staff cleaned Stemple's wounds and applied a dry dressing. There were no signs of infection. ECF 35-4 at pp. 12-14, 94; ECF 35-5 ¶ 5 (stating Stemple received wound care and cleaning for six days).

On June 9, 2017, Wilson saw Stemple at sick call for complaints of upper back pain from his stab wounds. ECF 35-4 at p. 16. Stemple stated his medications were ineffective. He was taken off Baclofen, his Neurontin was increased and he was placed on Nortriptyline. ECF 35-4 at p. 16. Stemple said his pain had worsened because it was not being managed with his previous medications, which helped him, and claimed his new injury aggravates his pain. ECF 35-4 at p. 16. Wilson prescribed Tylenol 500 mg.

---

[5] Tylenol #3 contains acetaminophen and codeine. *See* https://medlineplus.gov/druginfo/meds.

and a one-time dose of Mobic for pain relief. ECF 35-4 at p. 17.

Wilson's medical notes indicate that Stemple was seen on June 22, 2017, but the changes made to his medications on that date were not reflected in the EPHR (Electronic Personal Health Record). On June 22, 2017, Stemple's Tylenol and Excedrin were discontinued because they were not relieving his headache pain. ECF 35-4 at p. 19. Because Stemple mentioned that Fioricet had provided relief in the past, Wilson prescribed Fioricet for him and ordered an optometry consultation, noting his vision complaints and headaches might be associated with a need for glasses. Stemple also was prescribed Baclofen. Wilson discontinued Stemple's Nortriptyline prescription because it made Stemple sick to his stomach. Wilson renewed Stemple's other medications, started him on fish oil for his high cholesterol, and ordered a physical therapy consultation. ECF 35-4 at pp. 19, 21, 22.[6]

On July 18, 2017, Titilayo Otunaga, N.P. saw Wilson for shoulder and neck pain which Stemple rated as 10 out of 10. ECF 35-4 at p. 24. Otunaga observed Stemple had approximately 1 cm healed stab wounds on both shoulders, full range of motion with tenderness, and mild swelling at the base of the left side of his neck at the proximal clavicle. ECF 35-4 at p. 24. Otunaga ordered an x-ray of Stemple's left shoulder. ECF 35-4 at p. 24. Stemple reported Tylenol and Motrin did not relieve his pain, so Otunga increased his Baclofen to 20mg twice daily. ECF 35-4 at pp. 24-26.

On July 21, 2017, Stemple was transferred to MCTC. ECF 23-6 at p. 4.

On August 17, 2017, Monica Stallworth, M.D., examined Stemple in the Chronic Care Clinic at MCTC for pain management. ECF 35-4 at p. 28. She renewed his

---

[6] The June 29, 2017 record shows Stemple was started on Baclofen and Fioricet that day, which may be because the changes ordered on June 22, 2017 were not reflected on the EPHR. ECF 35-4 at p. 21.

prescription for Neurontin. ECF 35-4 at p. 28. The medical records show Stemple had active prescriptions for Fioricet and Baclofen. ECF 35-4 at p. 28. Stallworth ordered follow-up appointments in the Neurology, Internal Medicine, and Pain Management Clinics to be scheduled. ECF 35-4 at pp. 30.

On August 31, 2017; Stemple complained to Harlan E. Woodward, RN, of constant and daily pain in his left shoulder collarbone area where a knot was also visible. ECF 35-4 at p. 32. He asserted that he was experiencing constant numbness in both of his arms and hands. ECF 35-4 at p. 32. He claimed that he had not received treatment for these problems stemming from his stabbing on May 21, 2017. ECF 35-4 at p. 32. Woodward's examination showed two 1/8 inch healed scars. ECF 35-4 at p. 32. Stemple reported the area of the scar was tender to the touch. ECF 35-4 at p. 32. There was no swelling or heat, although sun exposure or sun burn at the area was noted. ECF 35-4 at p. 32. The medical notes indicate Stemple was unable to raise his left arm above shoulder height. ECF 35-4 at p. 32. Stemple had full range of motion (ROM) of his head and neck. ECF 35-4 at p. 32. Stemple said he performs his activities of daily living (ADL) every day, including dressing himself. ECF 35-4 at p. 32. Woodward recommended Stemple continue using Baclofen and Neurontin for two months, apply hot and cold compresses, and continue stretching exercises. ECF 35-4 at p. 32. Woodward noted that as Stemple exited the dispensary, he pushed the door with his left arm without difficulty. ECF 35-4 at p. 32.

On October 10, 2017, Cassandra Nagel, LPN, saw Stemple for an ARP request that he submitted complaining about lack of treatment for his stab wounds. ECF 35-4 at p. 35. Nagel noted Stemple was seen by a physician in August, but he did not feel his

13

stab wounds were addressed. ECF 35-4 at p. 35. Nagel scheduled Stemple for a medical appointment the next week. ECF 35-4 at p. 35.

On October 17, 2017, Lori Slavick, P.A., met with Stemple for his complaint of pain related to the stabbing. ECF 35-4 at p. 36. At that time, Stemple said his pain medication was stopped and later renewed on August 17, 2017. ECF 35-4 at p. 36. He also complained he had difficulty sleeping. ECF 35-4 at p. 36. Slavick indicated that Stemple's x-ray showed an old injury to the right acromioclavicular joint.[7] ECF 35-4 at p. 36. Slavick submitted a request for a physical therapy consultation for Stemple. ECF 35-4 at pp. 36, 37.

On November 14, 2017, Steven Ryan, a physical therapist, evaluated Stemple to establish a program of physical therapy for him. ECF 35-4 at p. 38. The goal was to increase Stemple's strength and establish a self-management program. ECF 35-4 at p. 38. Stemple received physical therapy on November 16, 17, 21, 28, 30, 2017, December 5, 7, 12, 2017, January 30, 2018, and February 6, 13, 15, 20, 22, 27, 2018. ECF 35-4 at pp. 42, 44-46, 47, 50-52, 68-72, 75-76.

On November 16, 2017, Stemple met with Contah Nimely, M.D. ECF 35-4 at p. 39. Stemple complained of daily headache pain and back pain radiating from his right side since a 1988 motor vehicle accident. ECF 35-4 at p. 39. He also complained of left shoulder pain from his May 2017 assault. ECF 35-4 at p. 39. Nimely noted Stemple's use of Fioricet and advised him not to take the medication daily. ECF 35-4 at p. 39. She prescribed a different medication, Propranol, to help prevent headaches. ECF 35-4 at p. 40. She also ordered an x-ray of the neck and spine to rule out any mass. ECF 35-4 at p.

---

[7]The acromioclavicular joint "is a joint in the shoulder where two bones meet." *See* https://www. hopkinsmedicine.org/healthlibrary/conditions/orthopaedic_disorders/acromioclavicular_ac_joint_problems _22,AcromioclavicularJointProblems.

41. She continued Stemple's Fioricet, but indicated if the headaches did not improve, she would consider switching him to Imitrex and Naprosyn. ECF 35-4 at p. 40. Noting that Stemple was receiving physical therapy for his shoulder, Nimely considered extending physical therapy for strengthening the back and core muscles. ECF 35-4 at p. 40. She continued Stemple's Baclofen, and indicated that she planned to start Stemple on Cymbalta on December 17, 2017, when the Neurontin would be discontinued. ECF 35-4 at pp. 40, 43.

At his December 5, 2017 physical therapy session, Stemple said that his shoulder was worsening. ECF 35-4 at p. 47.

On December 6, 2017, Amy Jones, R.N, saw Stemple for his left shoulder pain. ECF 35-4 at p. 48. Jones observed the injury was well healed. ECF 35-4 at p. 48. Jones recommended that Stemple continue to follow his physical therapy program and take his prescribed medications. ECF 35-4 at p. 48. Jones noted that Stemple had been seen on November 16, 2017, for the same complaint. ECF 35-4 at p. 48.

On December 7, 2017, Stemple expressed no new complaints at his physical therapy session. ECF 35-4 at p. 50.

On December 12, 2017, Stemple told the physical therapist that he has made some functional progress although his pain level was unchanged. ECF 35-4 at p. 51. Stemple was approved for six more physical therapy sessions. ECF 35-4 at p. 51.

On December 16, 2017, Nicole Peck, R.N., saw Stemple for his complaints of shoulder and neck pain. ECF 35-4 at p. 53. Stemple reported that physical therapy was ineffective. ECF 35-4 at p. 53. He also said that he stopped taking Cymbalta because it caused his nose to bleed and caused nausea. ECF 35-4 at p. 53. Peck referred him to a

medical provider for evaluation. ECF 35-4 at p. 53.

On December 24, 2017, Stemple failed to show for his medical appointment. ECF 35-4 at p. 55.

On December 27, 2017, Robert Edwards, R.N. saw Stemple for back and neck pain and headaches. ECF 35-4 at p. 56. Stemple complained the medications that provided him relief had all been discontinued. ECF 35-4 at p. 56. Edwards told him that Neurontin was being phased out by the pharmacy. ECF 35-4 at p. 56. Stemple understood and asked for a suitable replacement. ECF 35-4 at p. 56. Neurontin has been identified by the Maryland Department of Public Safety and Correctional Services (DPSCS) State Medical Director as a medication with patterns of overuse and abuse. ECF 35-5 ¶ 6. The patterns of abuse include hoarding of the medications by inmates for improper use due to its narcotic and sedative effect and trading to other inmates for misuse in exchange for other benefits. ECF 35-5 ¶ 6. To address these issues, DPSCS has sought to end its use for non-FDA approved conditions barring exceptional circumstances. ECF 35-5 ¶ 7. Neurontin is approved as an anticonvulsant for seizure conditions and for treatment of neuropathic pain (nerve pain) caused by herpes virus or shingles (herpes zoster). ECF 35-5 ¶ 7. Stemple does not have these conditions. ECF 35-5 ¶ 7. Therefore, the Neurontin prescription was discontinued and Cymbalta substituted for his chronic pain. ECF 35-5 ¶ 7.

On January 5, 2018, Stemple complained to Amber Knoll, R.N., that Cymbalta gave him diarrhea and nose bleeds. ECF 35-4 at p. 57. She advised him to submit a sick call slip. ECF 35-4 at p. 57.

On January 16, 2018, Stemple complained to Jodi Ebersole, R.N., that Tylenol

16

was ineffective for his pain. ECF 35-4 at p. 62. Ebersole told him that he would be scheduled for the chronic care clinic the next week. ECF 35-4 at p. 62.

The same day, January 16, 2018, Yvette Ledjo, N.P., saw Stemple who wanted his medications renewed. ECF 35-4 at p. 64. Ledjo placed Stemple on a tapering dose of Neurontin and increased his Elavil (amitriptyline). ECF 35-4 at pp. 64-65.

On January 25, 2018, Stemple complained he was not receiving his pain medications. ECF 35-4 at p.66. Ledjo informed him that she was waiting for the medications to be approved for him. ECF 35-4 at p. 66.

At his February 15, 2018, physical therapy session, Stemple reported he was still the "same" and there had been no change. ECF 35-4 at p. 71. On February 27, 2018, Stemple reported some functional improvement, and additional physical therapy was recommended for him. ECF 35-4 at p. 76.

On February 28, 2018, Dr. Nimely examined Stemple. ECF 35-4 at p. 77. Examination revealed mild back and right shoulder pain with motion. ECF 35-4 at p. 78. Nimely recommended changing the Fioricet to Imitrex to control Stemple's headaches. ECF 35-4 at p. 77. She prescribed a trial of Medrol,[8] advised Stemple to follow his exercise program, ordered an x-ray, and scheduled him for follow-up at the chronic care clinic. ECF 35-4 at pp. 78-79.

On April 12, 2018, at MCTC, an inmate cut Stemple on the neck with a razor blade. ECF 35-4 at p. 80. Dr. Nimely and Robert Edwards, R.N., cleaned the wound, sutured the laceration, and prescribed Keflex and Ibuprofen. ECF 35-4 at p. 80. The

---

[8] Medrol is the brand name for methylprednisolone, a corticosteroid "similar to a natural hormone produced by…adrenal glands. It is often used to replace this chemical when…[a] body does not make enough of it. It relieves inflammation (swelling, heat, redness, and pain)." https://medlineplus.gov/druginfo/meds/a682795.html .

wound was on the right side of the neck from the area of the carotid artery across laterally to the adam's apple. ECF 35-4 at p. 80. The wound measured approximately 1-3 mm in width and 120 mm in length. ECF 35-4 at p. 82. Stemple said every time he left segregation for the general population, he was assaulted. ECF 35-4 at p. 80. As earlier noted, Stemple may raise his claims related to the April 12, 2018 assault at MCTC in Civil Action No., CCB-18-2573; the claims will not be addressed in the context of these consolidated cases.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.,* 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (citing *Henry v. Purnell,* 652 F.3d 524, 548 (4th Cir. 2011) (citation omitted)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton,* 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor. *Scott v. Harris,* 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts,* 780 F.3d 562, 568-70 (4th Cir. 2015). At the same time, the court must "prevent

factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). The court also is mindful that Stemple is self-represented and it must liberally construe the pleadings of pro se litigants. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

### A. Claims Against the State Defendants

The State Defendants move for summary judgment in their favor on several grounds including Stemple's failure to exhaust administrative remedies and Eleventh Amendment immunity.

#### 1. Exhaustion of Administrative Remedies

State Defendants assert that Stemple's claim has not been properly presented through the administrative remedy procedure and therefore it must be dismissed pursuant to 42 U.S.C. § 1997e. The Prison Litigation Reform Act (PLRA) provides, in pertinent part, 42 U.S.C. § 1997e:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 527 (D. Md. 2003).

Administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. The failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.3d 674, 681-82 (4th Cir. 2005).

A claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 219-20. In other words, exhaustion is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

The exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his

administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level") (citations omitted); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

DPSCS has made an "administrative remedy procedure" (ARP) available to Maryland State prisoners for "inmate complaint resolution." *See generally*, Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against...official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Of importance here, exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds by *Porter v. Nussle*, 534 U.S. 516 (2002)). In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *See also Miller v. McConneha, et al*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D. Md. November 11, 2015).

The State Defendants accurately note that Stemple did not initiate an ARP alleging failure to protect in regard to the May 21, 2017, stabbing before he filed his complaints in this court on June 2, and June 28, 2017. Stemple filed ARP 494-17 twice, on June 7 and June 19, 2017, alleging loss of personal property,[9] and later withdrew the ARPs. ECF 23-6 at pp. 58-60. Stemple also filed ARP requests complaining about medical care for his stab wounds on June 19, June 23, and July 11, 2017, but these ARP requests were also filed after he initiated this lawsuit. State Def. Memorandum, ECF 23-2 at pp. 7-8.

On June 19, 2017, Stemple filed ARP 520-17, asserting that it had been 21 days after the stabbing and he had received no medical attention and was in pain. ECF 23-2 at p. 7. The ARP was investigated and dismissed after finding that Stemple had been receiving and continued to receive medical treatment. ECF 23-6 at pp. 54-60. Warden Wolfe's response reads in part:

> According to the Health Service Administrator, in review of the documentation you are being seen and treated for your concern of pain. You were last seen on 6/29/17 by the provider. After being seen you were ordered Baclofen, Gabapentin, and Firocet. A consult was also put in for you to receive Physical Therapy. You are being seen and treated for your medical concerns. You have been evaluated by the provider. Medical is awaiting disposition of your Physical Therapy consult.

---

[9] To the extent Stemple may intend to raise a claim for loss of personal property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (unauthorized intentional deprivation of property by prison guard did not constitute violation of due process clause as meaningful post-deprivation remedies were available under state law); *Parratt v. Taylor*, 451 U.S. 527, 542–44 (1981) (negligent deprivation of inmate's property does not violate the due process clause, so long as meaningful post deprivation remedies are available), overruled in part on other grounds; *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Section 1983 vindicates federal rights, not tort claims for which there are adequate state law remedies. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Tucker v. Duncan*, 499 F.2d 963, 965 n.1 (4th Cir. 1974)). Stemple may pursue his loss of property claims under Maryland's Tort Claims Act and through the Inmate Grievance Office. The right to seek damages and injunctive relief through Maryland's courts and administrative agencies constitutes an adequate post-deprivation remedy. *See Juncker v. Tinney*, 549 F.Supp. 574, 579 (D. Md.1982).

ECF 23-6 at 55.

On June 23, 2017, Stemple filed ARP 556-17, which complained that he was returned from the UMMS Shock Trauma unit to segregation at JCI with no paperwork as to his segregation status and had not been sent to a regional hospital. ECF. 23-2 at p. 7. Further, he complained that he had not been seen by a doctor since the stabbing and had received pain medication for his back and head, but not for injuries incurred from the stabbing. ECF 23-6 at pp. 52-53. The institutional ARP coordinator dismissed the ARP on procedural grounds because it impermissibly raised multiple issues, but directed Stemple to resubmit his concerns with one issue per ARP form. ECF 23-6 at p. 52.

On June 23, 2017, Stemple also filed ARP 557-17. ECF 23-2 at p. 7. He stated that he was suffering severe pain in his upper back, neck, arms, and shoulder from his stab wounds. ECF 23-6 at p. 50. Stemple's concerns were investigated, and on July 27, 2017, the ARP was dismissed for lack of merit. ECF 23-6 at pp. 50-51. Warden Wolfe's response to the ARP states in part:

> According to the Health Service Administrator, in review of the documentation you are being seen and treated for your concern of pain. You were last seen on 6/29/17 by the provider. After being seen you were ordered Baclofen, Gabapentin, and Firocet. [sic] A consult was also put in for you to receive Physical Therapy. You were recently seen on 7/18/17 you were complaining of shoulder pain. The provider wrote a non-formulary medication in which your baclofen was increased.

ECF 23-6 at pp. 50-51 (alteration added).

On July 11, 2017, in ARP 593-17, Stemple asserted, "An [sic] yet to date 7-11-2017 I have still not seen a doctor or medication for the stabbing." ECF 23-6 at p. 49. The ARP was dismissed as repetitive to ARP 520-17. ECF 23-6 at p. 49.

Stemple did not appeal the ARPs that presented his medical complaints. He did,

23

however, appeal the decision on his ARP concerning loss of property. ECF 23-13 at pp. 2-11.

Stemple wrote a "Letter of Need for Help" to the IGO on August 3, 2017, stating that after he was stabbed on May 21, 2017, he was sent to UMMS and then returned to JCI where he was placed in segregation housing instead of a regional hospital. Decl. of Russell Neverdon, ECF 23-14 at p. 3. He complained that he filed "sick call after sick call" request until he saw Wilson on June 9, 2017, and she told him that she could not see him for the complaints connected to the stabbing, but would see him for his chronic care appointments to address issues concerning his lower back and headaches. ECF 23-14 at p. 3. He stated Wilson "gave me back the meds they took earlier on compound so now she said I am not shown on the computer as being stabbed." ECF 23-14 at p. 3.

The IGO treated the letter as a grievance filed on August 7, 2017, and directed Stemple to submit additional information to determine whether he had properly exhausted his administrative remedies before he submitted his IGO request. ECF 23-14 at pp. 5-6; ECF 23-14 ¶ 3(a). Stemple responded to the IGO by providing copies of three ARPs, JCI-520-17, 556-17, and JCI-593-17, a fourth dated June 29, 2017, which he avers he tried to file, but the correctional officer, whom he does not name, refused to accept it for signature. ECF 23-14 at pp. 7-14. The IGO dismissed the grievance on August 7, 2017, for failure to exhaust prerequisite administrative remedy procedures and for lack of jurisdiction as the IGO may not consider inmate grievances against the private health care contractor or its employees. ECF 23-14 ¶ 3(a). IGO Administrator Officer Audrey Brown informed Stemple:

> I noted that you provided three (3) ARP complaints with your response
> letter and all three of them are basically surrounding the same set of

24

circumstances with two of them (ARP JCI-0593-17 and ARP-JCI-0520-17) being dismissed on July 18, 2017 as repetitive. According to the ARP paperwork you provided, I infer from the dates on your paperwork; you failed to appeal to the Commissioner and allow time for the Commissioner to respond. Instead, you chose to submit additional ARP complaints. Therefore, you failed to properly exhaust the ARP process. Since the exhaustion requirement has not been waived for good cause shown, COMAR 12.07.01.06(B)(4) requires that this grievance be dismissed as wholly lacking in merit. No further action will be taken on this grievance.

ECF No. 23-14 at p. 16; *see also* ECF 23-14 ¶ 3(a).

Stemple does not dispute that he filed his complaints before he sought to resolve his claims by presenting them through the ARP process. Nor does Stemple refute that he failed to properly exhaust the administrative process. Plaintiff Opposition, ECF 27. As to his assertion in the Complaint that he attempted to file ARPs but correctional officers at JCI told him that they must be signed by a lieutenant or a higher ranking officer, Stemple does not identify the officers who purportedly refused his ARPs, specify the content of the allegedly rejected ARPs, or state when he tried to submit them. ECF 9 at p. 8. Stemple's assertion that correctional officers refused to accept his ARP forms is belied by the uncontroverted fact that he filed at least five ARPs during the period after the May 21, 2017 assault. Given these verified exhibits and declarations under oath, Stemple had not presented, much less exhausted, his administrative remedies when he initiated this case. Thus, even when the facts are viewed in the light most favorable to Stemple, the State Defendants are entitled to dismissal of the complaint.

Further, even assuming arguendo the court was to deem his claims properly exhausted, his claims against the State Defendants are unavailing for reasons to be discussed.

## 2. Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution bars suit in federal court against a State, one of its agencies or departments, or one of its officials acting in an official capacity, without a valid abrogation or waiver of the State's sovereign immunity. *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989); *Pennhurst State School & Hospital v. Haldeman*, 465 U.S. 89, 100-02 (1984); *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). Claims for monetary damages against the State Defendants in their official capacities are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp*, 465 U.S. at 101–02. Therefore Stemple's claims against the State Defendants in their official capacities for monetary damages are barred and must be dismissed.

## 3. Respondeat Superior

In order for respondeat superior liability to exist under 42 U.S.C. § 1983, a supervisor must have knowledge of and be deliberately indifferent to the alleged violation. *See Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994). The liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Bayard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability may attach under § 1983 if a plaintiff can establish three elements: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff,

(2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw*, 13 F.3d. at 799 (citations omitted).

Insofar as Stemple intends to hold the Wardens of MCI-H, WCI, JCI, and MCTC culpable, beyond naming them in the complaint, he makes no specific allegations against these individuals or suggests facts to find them culpable based on principles of supervisory liability. ECF 9. Warden Wolfe, who denied Stemple's ARP requests about medical care, relied on the information provided by the Health Service Administrator. ECF 23-6 at pp. 51, 55. When responding to inmate complaints about medical care provided to them, Warden Wolfe and his staff ordinarily rely on the reports, assessments and judgment of the contractor's trained medical staff to prepare any response for his signature. ECF 23-11 ¶ 4. Prison officials may rely on the expertise of medical providers. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (supervisory prison officials may rely on professional judgments of medical providers but may be found deliberately indifferent based on intentional interference in an inmate's medical care). Accordingly, the Wardens of MCI-H, WCI, JCI, and MCTC are entitled to summary judgment as a matter of law.

### 4. Eighth Amendment Claims

Prisoners' claims for failure to protect and inadequate medical care are examined in light of the Eighth Amendment, which prohibits "cruel and unusual punishments," such as those involving the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). "The Eighth Amendment's

prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (citing *Farmer*, 511 U.S. at 834.).

### a. Failure to Protect Claim

A failure to protect claim must satisfy an objective and subjective standard. Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834 (citation omitted). Nonetheless, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

To the extent Stemple faults the State Defendants for failing to investigate his safety concerns at MCI-H before his move to JCI, the record shows that he was placed on segregation after he spoke to Lieutenant Louk. After the JCI stabbing, an IID

28

investigation was requested and commenced on the same day of the incident. Further, as discussed below, Stemple's specific allegations against the individual correctional officers at JCI fail to support a failure to protect claim.

### i. Roland and Roman

The State Defendants argue that Stemple has failed to satisfy the requirements for an Eighth Amendment failure to protect claim because there is no evidence that they knew of a specific threat to him or that they exercised deliberate indifference to his safety. As to Defendants Captain Roland and Lieutenant Roman, Stemple states that after he was stabbed at JCI, they told him that he would be kept behind the door until he healed. ECF 9 at pp. 7-8. In other words, they assured Stemple that he would remain in segregated housing. Such assurance is not a cognizable basis for an Eighth Amendment claim. Stemple does not assert that either Roland or Roman was aware of an excessive risk of harm to him prior to the assault, and therefore his claim is unsupported.

### ii. McFarland

Stemple claims he wrote to Lieutenants McFarland and Shinko asking "Why? Do you all keep doing this," seemingly lamenting he is "behind doors" whereas at MCI-H he had a prison job working in the meat plant. ECF 9 at p. 6. McFarland, who allegedly told Stemple that he had a "bullseye on his back," offered to place Stemple in the general population but warned him that he might be at risk because of his situation at MCI-H. Stemple acknowledges that he declined McFarland's offer to remove him from segregation. Judging Stemple's assertions in the light most favorable to him, he fails to show that McFarland or Shinko were aware of a specific threat to him or that they acted with deliberate indifference to his safety. Stemple provides no verified exhibits or

declarations to rebut McFarland's declaration, in which McFarland states that: 1) he did not make the decision to transfer Stemple to JCI; 2) Stemple requested to be placed on administrative segregation: 3) Stemple asked the segregation review board to transfer him to a facility where he could hold a job and earn diminution credits; and 4) Stemple voiced no objection when told by the segregation review board of his impending move to JCI. ECF 23-7 ¶¶ 4-8.

### iii.  Lane

Stemple asserts Sergeant Lane told him there were no DMI members at JCI, assured him that he would be safe, and sent him to Building D, an older tier of mostly workers for shops. ECF 9 at p. 6; ECF 9-1 at p. 3.[10]  Importantly, Stemple does not assert that Lane was aware DMI members were housed at JCI or that Stemple's cellmate Carter, or any other inmate, posed a particular risk to him.  Stemple seems to fault Lane for assigning "a fellow of color" as his cellmate.  Stemple states he told Lane that is "why I was sent behind the door to start with," ECF 9 at p. 6, but does not allege Lane exposed him to an excessive risk by housing him with a "fellow of color."  Further, Stemple provides no affidavits or exhibits to refute declarations stating that cellmate Carter is not a member of DMI or affiliated with any prison gang, or that "[i]n May 2017, because of past gang violence, JCI did not house any known members of the DMI gang." ECF 30-1 ¶3; ECF 23-11 ¶ 6.  Here, there is no genuine dispute as to any material fact whether Lane knew of and disregarded an excessive risk to Stemple's safety.  Lane is entitled to judgment in his favor.

### iv.  Mooney

---

[10] ECF 9-1 contains plaintiff's supplement to his complaint.  Due to administrative error, this document's header incorrectly indicates that it is ECF 8.

Stemple claims he told Sergeant Mooney that he "had issues" with his cellmate. ECF 9 at p. 7. He claims Mooney promised three times to discuss the problem with him. ECF 9 at p. 7. Stemple does not allege he specified the nature of those issues to Mooney. Rather, Stemple claims Carter, his cellmate, said the DMI member who was killed (and whose killing purportedly would have prompted the segregation of AB members at MCI-H) had been his friend and that he did not "like the tough white man." ECF 9 at p. 7. Although Mooney allegedly told Stemple that "no one wants to house with your cellie," ECF 9-1 at p. 3, that statement is insufficient to attribute awareness to him that Carter was a DMI member or that he posed a threat of excessive risk to Stemple. Mooney declares that he never had any conversations with Stemple, and that prior to May 22, 2017, he had no information to lead him to believe that Stemple was in "any particular, substantial, or extreme risk to his health or safety by his cellmate or any other inmate." ECF 23-15 ¶ 4. Stemple provides no verified evidence to refute Mooney's declaration.

Even when the facts are viewed in the light most favorable to Stemple, there is no evidence that he informed Mooney or other State Defendants that his cellmate was an enemy or that he feared for his safety. In short, Stemple has failed to proffer evidence that the State defendants were aware of a particular and excessive risk of harm to him and failed to act, amounting to the deliberate indifference necessary to support an Eighth Amendment failure to protect claim. Accordingly, the State Defendants are entitled to summary judgment in their favor in their individual capacities as to the failure to protect claims.

**b. Medical Claim**

In order to state an Eighth Amendment claim for denial of medical care, a

31

plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to "deliberate indifference" to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it...[T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences...." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) (citation omitted). Correctional officials may rely on the expertise of medical providers. *See Shakka*, 71 F.3d at 167; *Miltier*, 896 F.2d at 854-55. Thus, to the extent Stemple seeks treatment from an outside medical provider, the State Defendants are entitled to rely on the determinations of prison medical personnel. Because Stemple does not specifically allege any State Defendant acted with deliberate indifference to or deliberately interfered with his medical care, they are entitled to summary judgment in their favor.

### c. Due Process Claim

Stemple additionally has failed to assert facts sufficient to demonstrate a violation of his due process rights. Where state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the prisoner's liberty interest may be implicated. *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005).

Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84). "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process

32

protection." *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . . harsh and atypical conditions" for Due Process protections to apply. *Id.* (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015). Where, as in *Bevarati*, conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment. *Beverati*, 120 F.3d at 503. Where an inmate is sentenced to death row, as in *Prieto*, "using the general population to gauge the ordinary incidents of prison life ....was improper." *Incumaa*, 791 F.3d at 528 (citing *Prieto*, 780 F.3d at 252-54). While the nature of a prisoner's conviction and the length of his sentence do not give rise to differing liberty interests, "state law mandates regarding the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence are, by definition, the ordinary incidents of prison life for such offenders." *Id.* (quoting *Prieto*, 780 F.3d at 254).

Stemple claims that he was placed in administrative segregation at JCI after he was stabbed on May 21, 2017, instead of being placed in the regional hospital. Even if the factual basis of the claim is true, it fails to support a due process claim. First, medical staff decided Stemple should be released to custody after he was discharged from UMMS; the state defendants did not have the authority to assign Stemple to a regional

hospital absent medical necessity to do so. *See e.g.* ECF 23-11 ¶ 2; ECF 23-12 ¶ 2. Second, Stemple was placed on administrative segregation for his safety and security. Even if Stemple did not receive "paperwork" for the placement as claimed, such oversight as alleged here, does not support a claim of constitutional dimension.

Lastly, to the extent Stemple faults the State Defendants for failing to bring charges against Calvin Carter, the IID report shows the matter was transferred to the State's Attorney's Office. In Maryland, the decision to prosecute a criminal action is determined by the State's Attorney. *See* Md. Code Ann., Crim. Proc. § 15-102 (West 2008) ("... a State's attorney shall ... prosecute ... all cases in which the State may be interested"). "[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Thus, Stemple provides no grounds for entitlement to this relief. For all these reasons, summary judgment will be granted in favor of the State Defendants.

## III. Wilson's Response

In order to state an Eighth Amendment claim for denial of medical care, Stemple must demonstrate that Wilson's actions or failure to act amounted to "deliberate indifference" to a serious medical need. *See Estelle*, 429 U.S. at 106. Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178 (citation omitted); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

Amendment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. An inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Wilson does not dispute that Stemple's reports of pain from his then-recent stab wounds constituted a serious medical need. Wilson saw Stemple on June 9, June 22, and June 29, 2017 to treat him for his chronic headaches and back pain. On June 9, 2017, Wilson prescribed Tylenol Extra Strength 500 mg and Mobic for Stemple's pain, and on June 29, 2017, restarted Baclofen and Neurontin. ECF 35-4 at pp. 17, 19, 21. The medical records from those dates indicate Stemple was not in any apparent distress. ECF 35-4 at pp. 17, 19. In his unsworn "Statement of Affidavit," Stemple asserts Wilson said the records did not show that he was in segregation, but was apparently to be seen for chronic care treatment. ECF 39 at p. 2. Stemple states after he showed Wilson his wounds, she reinstated his prior pain medications. ECF 39 at p. 2. In so doing Wilson acted in response to his concerns, albeit not to Stemple's satisfaction. In his opposition, however, Stemple seems to fault her for not providing him with medication specifically for his stabbing related pain. ECF 39 at p. 2. Of note, Stemple does not assert that his wounds were infected or were otherwise not healing properly, and cannot diagnose whether these medications also addressed his other pain symptoms.

Erwin Aldana, M.D., reviewed Stemple's medical records in response to this lawsuit, and states it is his opinion "to a reasonable degree of medical probability" that Stemple received "appropriate medical treatment for this low back, shoulder and neck

pain, stab wounds, and headaches this would include the care provided to Plaintiff by Hettie Wilson, P.A." ECF 35-5 ¶ 10. Clearly, Stemple disagrees with the medication provided to him and its effectiveness for his pain concerns. But, even if Wilson saw Stemple only for his chronic pain conditions as he claims, Wilson was prompted to provide him medication upon examining his stab wounds. Stemple's allegations are insufficient to support a constitutional claim of deliberate indifference.[11]

## CONCLUSION

For these reasons, the court will deny Stemple's Motions to Intervene and Motion to Compel and will grant the State Defendants' and Wilsons's Motions for Summary Judgment in a separate order which follows.

9/19/18
Date

Catherine C. Blake
United States District Judge

---

[11] In light of the care provided to Stemple for the stab wounds incurred at JCI, the court finds no basis to order treatment by a provider outside the prison.